Steven N. Williams (SBN #175489)
swilliams@cpmlegal.com
Gene W. Kim (SBN #279549)
gkim@cpmlegal.com
Elizabeth Tran (SBN #280502)
etran@cpmlegal.com
**COTCHETT PITRE & McCARTHY LLP**
San Francisco Airport Office Ctr.
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Attorney for Plaintiff and the Proposed Class

(Additional Counsel on signature page)

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA MARKET, LLC. a/k/a/ GAJU MARKET on Behalf of Itself and a Class of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> NONGSHIM CO., LTD.; NONGSHIM AMERICA, INC.; OTTOGI COMOPANY, LTD.; OTTOGI AMERICA, INC.; SAM YANG FOODS COMPANY, LTD.; SAM YANG U.S.A., INC.; KOREA YAKULT COMPANY, LTD., and PALDO COMPANY, LTD. <br><br> Defendants. | CASE NO. _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................. 1

II.     JURISDICTION AND VENUE ......................................................... 4

III.    PLAINTIFF ..................................................................................... 5

IV.     DEFENDANTS ................................................................................ 5

V.      INTERSTATE TRADE AND COMMERCE ..................................... 9

VI.     INTERSTATE TRADE AND COMMERCE ..................................... 9

VII.    CLASS ACTION ALLEGATIONS ................................................... 9

VIII.   FACTUAL BACKGROUND ........................................................... 11

      A.   Defendants Dominate the Korean Noodles Market,............... 11
      Within the United States Ramen Noodle Market. ................... 11
      B.   Ramen Assembly Conference ................................................ 12
      C.   Meetings Among Defendants and the First Price
      Increase in 2001 .................................................................... 13
      D.   Second Price Increase: October 2002 to January 2003 .......... 18
      E.   Third Price Increase: December 2003 to April 2004 .............. 18
      F.   Fourth Price Increase: December 2004 to April 2005 ............ 20
      G.   Fifth Price Increase: March to September 2007 ..................... 22
      H.   Sixth Price Increase: February to April 2008 ........................ 23
      I.   March 2008 Ramen Conference ............................................. 25
      J.   KFTC Order .......................................................................... 26
      K.   The Seoul High Court Upheld the KFTC's Ruling. ................ 26
      L.   The Conspiracy Directly Affected the Korean Noodles
      Sold in the United States. ....................................................... 27
      M.   Plaintiff's Claims Are Not Barred by the Statute of
      Limitations ............................................................................ 33

IX.     CLAIM FOR RELIEF ................................................................... 36

      Violation of Sections 1 and 3 of the Sherman Act, 15
      U.S.C. §§ 1, 3 ......................................................................... 36

PRAYER FOR RELIEF ......................................................................... 37

DEMAND FOR JURY TRIAL ............................................................... 40

CLASS ACTION COMPLAINT

Plaintiff California Market, LLC. a/k/a/ Gaju Market ("Gaju" or "Plaintiff"), individually and on behalf of a class of all those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against the defendants, and alleges:

## I.      INTRODUCTION

1.      Gaju brings this antitrust class action on behalf of all persons and entities who directly purchased Korean Noodles in the United States from the named defendants, or any subsidiaries or affiliates thereof, from May 2001 to the present (the "Class Period").  The allegations in this complaint are based upon information and belief, and based on the investigation of the counsel, except for those allegations relating specifically to Gaju, which are based upon personal knowledge.

2.      Gaju alleges that the defendants, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, conspired, combined, or contracted to fix, raise, maintain, or stabilize the prices of Korean Noodles that they sold to Gaju and the other members of the Class.  As a result of the defendants' unlawful conduct, Gaju and other members of the Class paid supra-competitive prices for Korean Noodles, and thus suffered injury of the type the federal antitrust laws are designed to prevent.

3.      As used herein, "Korean Noodles" refer to instant ramen noodles manufactured by any of the named defendants or their subsidiaries or affiliates.  Korean Noodles are dried or pre-cooked noodles usually sold with flavoring powder and/or seasoning oil.  Korean Noodles are sold either in a packet or in a disposable bowl.  Korean Noodles in packets can be cooked within minutes in boiling water, and Korean Noodles in bowls can be prepared by simply adding hot water.  There are approximately 150 kinds of Korean Noodles.

4.      As the Korean Noodles market matured within South Korea, it left little room for growth.  The defendants sought to sell more Korean Noodles outside Korea, including in the United States.

5.      Also, when the Korean Noodles market became saturated within South Korea, the defendants sought profits through collaborating on price increases on Korean Noodles.

6.      The conspiracy began in late December 2000 or early January 2001 when

1

representatives from the defendants met at Renaissance Hotel in Seoul, Korea, and agreed on a price increase on Korean Noodles.  They specifically agreed upon a strategy: one defendant, Nongshim, would first increase the price for its Korean Noodles, and other defendants would follow.

7.      The defendants implemented their conspiracy through meetings, including at meetings of their trade association, the Ramen Assembly, and through repeated, detailed exchanges of their plans regarding price increases and other confidential competitive information. These repeated exchange of information permitted the defendants to police their agreement and to ensure that no defendant was "cheating."

8.      The defendants also used the "Old Price Support" method in order to enforce compliance with their conspiracy.  Under this method, one of the defendants would typically announce the plan to increase the price for its Korean Noodles a few weeks before the effective date of the price increase.  If the other defendants failed to also announce their own price increase, then the first defendant to announce the price increase would simply postpone the effective date until other defendants announced their own price increase.  In fact, according to a report by Korea Yakult titled "The Analysis of Effect of Price Increase," Nongshim once delayed the effective date of the announced price increase for 82 days because Samyang and Ottogi delayed their respective price increases.

9.      On May 10, 2001, Nongshim announced its plan to raise the price for its Korean Noodles, and, on the same day, other defendants also announced they were contemplating price increases.

10.      Subsequently, the defendants exchanged pricing data, in order to confirm one another's position and to inform their own price increase.  By July 2001, other defendants also increased the price of their Korean Noodles, typically making their products match the pricing of Nongshim's Korean Noodles.

11.      In this way, the defendants collaboratively and systematically increased the price of Korean Noodles at least six (6) times during the Class Period.

12.      This conspiracy was concealed from the public until July 12, 2012, when the

Korean Fair Trade Commission ("KFTC") issued an order (the "KFTC Order") revealing that the defendants had conspired to fix, maintain, raise and/or stabilize prices for Korean Noodles.  The KFTC Order required the defendants to pay a total of ₩136 billion KRW (approximately $120 million USD).  Samyang avoided its portion of the penalty because it voluntarily reported the conspiracy to the South Korean government in order to avail itself of the Leniency Program.

13.     On November 8, 2013, in an action commenced by Nongshim and Ottogi to vacate the penalties imposed by the KFTC, the Seoul High Court ruled against Nongshim and Ottogi, and upheld the KFTC's ruling.  In the Opinion, the Seoul High Court found:

> Ramen manufacturers sequentially implemented price increases within a close time period, deciding upon similar levels of increase.  For important products with a lot of market share, the pricing was the same - down to ₩1 KRW. ….  Without exchange of pricing information, based solely on the information obtained through the media or independent market study, it would have been difficult to prepare such precise and detailed information regarding competitors' prices.  Therefore, it appears that the pricing aligned as a result of the exchange of pricing information.

14.     Similarly, Yakult sought to vacate the penalties imposed by the KFTC.  On December 4th, 2013, the Seoul High Court ruled against Yakult and upheld the KFTC's ruling against it.[1]

15.     As the KFTC found, much of the information that the defendants shared before and after their price increase in Korean Noodles had little to do with their respective business operations; the information was relevant only for the purpose of price-fixing.  During the Class Period, the defendants exchanged more than 340 e-mails in furtherance of their conspiracy.  For example, Nongshim and Samyang shared sensitive, pricing-related information through more than 150 e-mails regarding sales, business support programs, plans to launch new Korean Noodles, and organizational/personnel changes.  The excessive sharing of what should have been confidential information among competitors increased the transparency among the defendants,

---

[1] Nongshim, Ottogi and Yakult have indicated that they plan to appeal from the Seoul High Court's ruling.

3

facilitating their conspiracy to price-fix and discouraging one another from pricing their Korean Noodles independently.

16.     Notably, the KFTC found that there was never any notable disruption or interruption in defendants' conspiracy and collusion to increase the price of Korean Noodles while the six price increases were implemented.  In other words, defendants' conspiracy was continuous and repetitive.

17.     The defendants' price-fixing conspiracy also specifically increased prices for Korean Noodles sold in the United States and its territories (collectively, the "United States").

## II.     JURISDICTION AND VENUE

18.     Gaju brings this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from the defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

19.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331, 1337.

20.     Venue is proper in this judicial district pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) and 28 U.S.C. § 1391(b), (c), and (d), because a substantial part of the events giving rise to the claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more of the defendants reside, are found, have agents, and/or transact business in this district.

21.     This Court has personal jurisdiction over each of the defendants because they directly and/or through affiliates: (a) have headquarters in this district, (b) transacted business throughout the United States, including in this district, (c) have had substantial contacts with the United States, including in this district; and/or (d) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

22.     The defendants' conduct alleged in this complaint involves import trade and import commerce from the Republic of Korea ("Korea" or "South Korea").  The conduct had a direct, substantial, and reasonably foreseeable effect on the trade and/or commerce in the United

4

1  States.

2                    III.    **PLAINTIFF**

3      23.    Plaintiff California Market, LLC. a/k/a/ Gaju Market is a Korean market that has

4  been providing the community with diverse products including Korean groceries since 1987.

5  Gaju is headquarterd at 4317 Beverly Blvd., Los Angeles, CA 90004.   Currently, Gaju is

6  transforming its 450 S. Western Avenue location into a three-story, 315,643 squre foot, state-of-

7  the-art commercial complex.

8      24.    During Class Period, Gaju paid millions of dollars to directly purchase Korean

9  Noodles from one or more of the defendants.

10     25.    As a result of the defendants' federal antitrust law violations described herein,

11 Gaju was injured in its business or property.

12                    IV.    **DEFENDANTS**

13 **A.    Nongshim**

14     26.    Defendant Nongshim Co., Ltd., established in 1965, is organized and existing

15 under the laws of South Korea with its principal place of business in Dongjak-Gu, Seoul, South

16 Korea.  Nongshim Co., Ltd. is a leading food company in South Korea.  Since the 1990s,

17 Nongshim Co., Ltd. has had a dominant market share in Korea, and since 2010, it has maintained

18 approximately 70% of the Korean Noodles business in Korea.

19     27.    Since 1971, Nongshim Co., Ltd. has exported food propducts, including Korean

20 Noodles, to the United States, and has held a dominant share of the Korean Noodles market in

21 the United States during the Class Period.

22     28.    Defendant Nongshim America, Inc. ("Nongshim America") was established in

23 1994, and is headquartered in Rancho Cucamonga, California.  It also has other locations in

24 Emeryville California, Texas, New Jersey, Illinois, Georgia, and Maryland.

25     29.    Defendant Nongshim Co., Ltd. owns non-defendant Nongshim USA Holdings,

26 Inc., which in turn owns Defendant Nongshim America.

27     30.    Defendants Nongshim Co., Ltd. and Nongshim America are collectively referred

28 to as "Nongshim."

                                        5

31.     In February 2004, Mr. Yong-Hoon Lee of Nongshim America stated, "Because Korea [Nongshim Co., Ltd.] increased the ramen price by 6.5% on average, the import price [from Korea] also increased. …. We decided to increase the ramen price [in the United States] by 8-9%, starting in April."

32.     In December 2004, Mr. Myung-Chul Shin of Nongshim America stated, "It is customary for the export price to increase when the price within Korea increases."  Mr. Yong-Hoon Lee of Nongshim America also stated, "Last year, after the November price increase [in Korea], the price increase became effective in the United States starting in April.  This year will be similar."

33.     In June 2005, Nongshim established its United States manufacturing facility in Rancho Cucamonga, California, in order to expand its business into the American market.  The factory has an annual production capacity of approximately 200 million Korean Noodles.

34.     Some of the Korean Noodles that Nongshim sells in the United States, including Shin Ramyun, Japaghetti, and Cup Ramen, are now manufactured in California.  The rest of the Korean Noodles that Nongshim sells in the United States are still imported from South Korea.

35.     On February 21, 2008, Mr. Myung-Chul Shin, Nongshim America's manager for the East Coast, stated, "Right now we are waiting for the announcement from the parent company in Korea.  In Korea, the price increase becomes effective immediately after the announcement.  But, in the United States, there should not be any sudden price increase because, customarily, there is usually one or one and a half month of waiting period.  But, we expect the price increase to become effective [in the United States] in March or April."

36.     Mr. Yong-Hoon Lee of Nongshim America, who is in charge of distribution, stated, "Currently we are supplying 14 products manufactured in the United States and approximately 30 items shipped from Korea.  Because most products are ramen and snacks, which require flour, price increase is inevitable."

37.     In 2012, Nongshim's revenue from the sale of Korean Noodles in the Unites States was approximately $140 million.

38.

**B.      Ottogi**

39.     Defendant Ottogi Company, Ltd. was formed in 1969, and is headquartered in Daechi-dong, Gangnam-Gu, Seoul, South Korea.

40.     Defendant Ottogi America, Inc. ("Ottogi America") was formed in 2005, and is headquartered in Gardena, California, where it maintains a warehouse.  Ottogi America is a wholly owned and controlled subsidiary of Ottogi Company, Ltd.  Ottogi America distributes Ottogi Company, Ltd.'s products, including Korean Noodles, all over the United States and Canada.

41.     Defendants Ottogi Company, Ltd. and Ottogi America are referred to collectively as "Ottogi."  Ottogi's Korean Noodles are all manufactured in Korea.

**C.      Samyang**

42.     Defendant Sam Yang Foods Company, Ltd. is headquartered in Seongbuk-Gu, Seoul, Korea.

43.     In connection with the KFTC investigation, Sam Yang Foods Company, Ltd., its executives, and employees fully cooperated with the government, providing evidence for the defendants' antitrust violations and admitting Sam Yang Foods Company, Ltd.'s wrongdoing as part of the conspiracy.

44.     For example, Exhibit 46 in the KFTC Order is a statement by Sam Yang Foods Company, Ltd.'s Kim, which states:  "… in the ramen market, as described above, exchange of pricing information and actual price increase took place systematically and repetitively."

45.     Additionally, Exhibit 24 in the KFTC Order is a statement by Sam Yang Foods Company, Ltd.'s Kim, which states: "The day after Mr. Choi had attended the meeting [in late December 2000 or early January 2001 at Renaissance Hotel in Seoul, Korea] among the representatives from ramen companies, I asked, "what did you discuss?"  Mr. Choi replied, "… we discussed how there has not been any price increase for the past 2-3 years, but, if Nongshim increases the price first, we would all increase the price in response."  Also, Exhibit 45 in the KFTC Order is a statement by Sam Yang Foods Company, Ltd.'s Wee in the Marketing Department, which states, "The rule was to share information regarding confirmed price-increase

plan among [Defendants] prior to the announcement to the distribution channel."

46.    Defendant Sam Yang U.S.A., Inc. ("Samyang USA") is headquartered in Santa Fe Springs, California.  Samyang USA sells and distributes Samyang Foods Company, Ltd.'s Korean Noodles throughout the United States.  Upon information and belief, Samyang USA has a long-term, exclusive distributorship agreement with Samyang Foods Company, Ltd. YellowPages.com describes Samyang USA as "a part of Sam Yang Foods Co. Ltd. who manufactures soy sauce products, ice cream and fresh milk."

47.    In 2005, Mr. Shi-Young Lee of Samyang USA admitted, "The impact of the ramen price increase by 8% in early March in Korea will reach the U.S. around July."

48.    Defendants Sam Yang Foods Company, Ltd. and Samyang USA are collectively referred to as "Samyang."  Samyang's Korean Noodles are all manufactured in Korea.

**D.    Yakult**

49.    Defendant Korea Yakult Company, Ltd. ("Korea Yakult"), founded in 1969, is based in Seocho-Gu, Seoul, Korea.  It makes beverages, Korean Noodles, and dairy products. During Class Period, Korea Yakult did business in California as Paldo America, Inc. ("Paldo America").

50.    Paldo America was a wholly owned and controlled subsidiary of Korea Yakult. Paldo America was located in Los Angeles, California.  Paldo America distributed Korea Yakult's Korean Noodles throughout the United States during Class Period.  But, based on information and belief, Paldo America no longer exists.

51.    In January 2012, Defendant Paldo Company, Ltd. was established as a spin-off from Korea Yakult.  Previously, for decades, "Paldo" was a Korean Noodles brand within Korea Yakult.

52.    Since July 2012, Paldo Company, Ltd. has been doing business in Los Angeles, California.

53.    Korea Yakult and Paldo Company, Ltd. are collectively referred to as "Yakult." Yakult's Korean Noodles are all manufactured in Korea.

54.    Nongshim, Samyang, Ottogi, and Yakult are collectively referred to as

8

"Defendants."

## V.  NON-DEFENDANT CO-CONSPIRATORS

55.     Various entities not named as defendants have participated in the violations alleged herein and have performed actions and made statements in furtherance thereof.  Plaintiff reserves the right to name some or all of these entities at a later date.  The acts alleged herein were ordered, or done by duly authorized officers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

## VI.  INTERSTATE TRADE AND COMMERCE

56.     During the Class Period, each Defendant, or one or more of its subsidiaries, sold Korean Noodles in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and in this this judicial district.

57.     During the Class Period, Defendants collectively controlled a vast majority of the Korean Noodles market in the United States.

58.     The violations of federal antitrust laws by Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VII.  CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(2) and 23 (b)(3) on its own behalf and on behalf of the following class (the "Class"):

> All persons and entities in the United States who directly purchased Korean Noodles from Defendants at any time from May 2001 through the present. Excluded from the Class are Defendants, co-conspirators, and any of their subsidiaries or affiliates.  The Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

60.     Members of the Class are so numerous that joinder is impracticable.  Due to the nature of the trade and commerce involved, Plaintiff believes that the Class members number in at least thousands and are so geographically diverse that joinder of all Class members is impracticable.

9

61.     Plaintiff's claims are typical of the claims of other Class members, as they arise out of the same course of conduct.  Plaintiff's interests are aligned with, and are not antagonistic to, those of the other members of the Class.  By proving Plaintiff's claims, Plaintiff will prove other Class members' claims.

62.     Questions of law and fact are common to all members of the Class, and such common issues of law and fact predominate over any questions affecting only individual members of the Class.  The common issues of law and fact include, but are not limited to, the following:

a.     whether Defendants engaged in or entered into a contract, combination or conspiracy among themselves to fix, maintain, raise and/or stabilize the prices of Korean Noodles sold to Class members in the United States;

b.     the duration of the contract, combination, or conspiracy alleged herein;

c.     whether Defendants violated Section 1 of the Sherman Act;

d.     whether the conduct of Defendants and their co-conspirators caused antitrust injury to the business or property of Plaintiff and Class members;

e.     the appropriate measure of damages sustained by Plaintiff and Class members;

f.     whether injunctive relief is appropriate; and

g.     the appropriate class-wide measure of damages.

63.     These common questions of law and fact predominate over questions, if any, that affect only individual Class members.

64.     Plaintiff and its counsel can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, in conflict with, or are antagonistic to the interests of the Class.  Plaintiff understands and appreciates its duties to the Class under Rule 23 of the Federal Rules of Civil Procedure, is determined to diligently discharge those duties, and is committed to vigorously protecting the rights of absent Class

10

members.  Plaintiff has retained counsel competent and experienced in the prosecution of class action lawsuits and, in particular, antitrust class action lawsuits.  Plaintiff and counsel have the necessary financial resources to adequately and vigorously litigate this class action.

65.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

66.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because common questions predominate over individual questions and a class action is the superior procedural vehicle for fairly and efficiently adjudicating the claims asserted.

67.     The questions of law and fact common to the members of the Class, as identified above, predominate over any questions affecting only individual members, including legal and factual issues relating to the Defendants' liability and damages.  Plaintiff's claims and other Class members' claims arise from the same course of conduct, and Plaintiff and other Class members share the same legal rights.

68.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation and the risk of inconsistent rulings.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This action presents no difficulties in management that would preclude maintenance as a class action under both Fed. R. Civ. P. 23(b)(3).

## VIII.   FACTUAL BACKGROUND

**A.     Defendants Dominate the Korean Noodles Market,
Within the United States Ramen Noodle Market.**

69.     Korean Noodles with their Korean taste are distinct from other types of noodles sold in the United States, including Japanese ramen products.  Korean Noodles contain unique

spices, which typically have a bolder flavor than other instant noodles from Japan, or elsewhere.  As a result, consumers are unlikely to switch from Korean Noodles to other instant noodles in response to a price increase.

70.     For example, Nongshim's "Shin Ramyun" is the best-seller of their Korean Noodles.  On average, 3 million packs of Shin Ramyun are sold "daily," and they make up over 70% of Nongshim's revenue and over 25% of all Korean Noodles sales in the world. Nongshim touts, "Nongshim Shin Ramyun can make a man cry!  ….  You might be surprised by the level of spiciness at first, but the delicious mélange of flavors will soon have you crave for more."  *See* http://www.nongshimusa.com/our-products/meal-noodle/shin-ramyun.

71.     Defendants dominate the Korean Noodles market: Nongshim owns approximately 70%, and the other Defendants own the remaining 30% of the Korean Noodles market.

72.     During the relevant time period, Defendants sold hundreds of millions worth of Korean Noodles in the United States.

**B.      Ramen Assembly Conference**

73.     During Class Period, representatives from Defendants attended the Ramen Assembly Conference at least eight (8) times at Capital Hotel in Seoul, Korea, on March 28, 2001; March 21, 2002; March 31, 2003; March 25, 2004; March 22, 2005; March 28, 2006; March 28, 2007; and March 26, 2008.

74.     The chairman of the Ramen Assembly was a Nongshim executive, and the representatives from the three other Defendants attended as directors.  Also, each Defendant sent one additional employee to the Ramen Assembly Conference.

75.     Ramen Assembly was organized for legitimate purposes including orderly distribution of Korean Noodles and promoting trade, but it also served as an opportunity for Defendants to conspire to fix the price for Korean Noodles and promote collaboration among competitors.

76.     The KFTC found that:

a.   at the March 28, 2001 Ramen Assembly Conference, Defendants agreed to

increase the price for Korean Noodles;

    b.  at the March 28, 2007 Ramen Assembly Conference, Defendants exchanged information regarding price increase for Korean Noodles; and

    c.  at the March 26, 2008 Ramen Assembly Conference, Defendants agreed not to decrease the price for Korean Noodles.

77.    Notably, the minutes from the March 19, 2008 Ramen Assembly Conference created by Yakult memorialized discussions regarding collaborative price increase for Korean Noodles among Defendants.

**C.**    **Meetings Among Defendants and the First Price Increase in 2001**

78.    In late December 2000 or early January 2001, Defendants and Bingre[1] met at Renaissance Hotel in Seoul, Korea, and agreed on price increase for Korean Noodles.  They decided that Nongshim would first increase the price and other Defendants would follow.

79.    The day after the meeting, Samyang's Managing Director Choi reported to Samyang's CEO Jun that the manufacturers agreed that if Nongshim raised its prices for Korean Noodles, the rest of the manufacturers would follow.

80.    Samyang's CEO Jun stated that, when he asked Choi whether the representatives at the meeting discussed pricing, Choi reported that, at the meeting, the representatives "talked about how the Korean Noodles business is not doing poorly despite the challenges stemming from the IMF crisis.  Then they asked, 'Shouldn't we raise Korean Noodles' prices?' and later they discussed having Nongshim increase prices and the others following suit."  Choi also reported that, if Samyang raised prices, "the revenue will increase by approximately ₩200-300 million KRW per month."

81.    According to a confession by a Samyang employee, a representative from Samyang reported to him, "[during the meeting at Renaissance Hotel,] we discussed that, we had not raised price for 2-3 years, but, once Nongshim increases the price, we would all

---

[1] In 1985, Bingre started to manufacture and sell Korean Noodles, but, on March 25, 2003, it abandoned Korean Noodles business.

increase the price, too."

82.     On March 28, 2001, at Capital Hotel in Seoul, Korea, Defendants attended the Ramen Assembly Conference.  Defendants discussed the progress in Nongshim's negotiation with Korean government regarding price increase and reviewed the estimated rate of price increase for their Korean Noodles.  At this meeting, Samyang, Ottogi, and Yakult urged Nongshim to increase the price by "two digits," *i.e.*, 10%.

83.     On May 10, 2001, Nongshim announced that it planned to increase the price for Korean Noodles, and, on the same day, other Defendants also announced they were reviewing respective price increases as well.

84.     Announcing the plan to increase price is usually not a desirable business strategy because (1) the demand for pre-price-increase Korean Noodles increases drastically, causing trouble with supply and (2) sales drastically drop after the price increase. Nevertheless, Nongshim still announced the plan to increase the price for its Korean Noodles in order to signal other Defendants and to create the overall atmosphere for price increase.

85.     As announced, on May 14, 2001, Nongshim reached the decision to increase the price for 34 types of Korean Noodles by 9.9%, effective May 21, 2001.

86.     Subsequently, Defendants exchanged pricing data, in order to confirm one another's position and to inform their own price increase.

87.     On May 14, 2001, Nongshim provided Samyang with information regarding price increase and the timing thereof.

88.     After reviewing this information, on May 17, 2001, Samyang reached the decision to increase the price for 17 types of Korean Noodles by 12% and to make its Samyang Ramen match the price for Nongshim's Shin Ramyun, effective June 1, 2001.

89.     Subsequently, on May 24, 2001, Samyang provided Yakult with the following information regarding price increase by facsimile:

14

90.     Further, on May 22, 2001, Ottogi created a document detailing the price

increase for Samyang's Korean Noodles:

### 상양 라면류 가격 인상 현황
( 01-05-22 )                                                     (단위:원)

| 구분 | 제 품 명 | 현 재 | | | 조 정 | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 출고가 | 소비자가 | 거래처이익률 | 출고가 | 인상률(%) | 소비자가 | 인상률(%) | 거래처이익률 |
| 봉지면류 | 사 리 면 | 158 | 250 | 30.5% | 158 | 0.0% | 250 | 0.0% | 30.5% |
| | 쇠고기맛면 | 220 | 330 | 26.7% | 255 | 15.9% | 380 | 15.2% | 26.2% |
| | 대관령김치라면 | 255 | 380 | 26.2% | 268 | 5.1% | 400 | 5.3% | 26.3% |
| | 신 육개장 | 260 | 400 | 28.5% | 302 | 16.2% | 450 | 12.5% | 26.2% |
| | 포장마차우동 | 260 | 400 | 28.5% | 302 | 16.2% | 450 | 12.5% | 26.2% |
| | 해물파티 | 302 | 450 | 26.2% | 335 | 10.9% | 500 | 11.1% | 26.3% |
| | 삼양라면참 | 302 | 450 | 26.2% | 322 | 6.6% | 480 | 6.7% | 26.2% |
| | 열무비빔면 | 302 | 450 | 26.2% | 335 | 10.9% | 500 | 11.1% | 26.3% |
| | 손 칼국수 | 302 | 450 | 26.2% | 335 | 10.9% | 500 | 11.1% | 26.3% |
| | 수 타 면 | 320 | 480 | 26.7% | 350 | 9.4% | 530 | 10.4% | 27.4% |
| | 삼선짜짜로니 | 330 | 500 | 27.4% | 367 | 11.2% | 550 | 10.0% | 26.6% |
| LL면 | 삼양생우동 | 715 | 1,100 | 28.5% | 780 | 9.1% | 1,200 | 9.1% | 28.5% |
| 용기면류 | 컵라면(육,김) | 290 | 450 | 29.1% | 335 | 15.5% | 500 | 11.1% | 26.3% |
| | 삼양라면컵 | 290 | 450 | 29.1% | 335 | 15.5% | 500 | 11.1% | 26.3% |
| | 육개장,김치라면 | 290 | 450 | 29.1% | 335 | 15.5% | 500 | 11.1% | 26.3% |
| | 보물보물도시락 | 300 | 450 | 26.7% | 335 | 11.7% | 500 | 11.1% | 26.3% |
| | 색다른수타면 | 430 | 650 | 27.2% | 465 | 8.1% | 700 | 7.7% | 26.9% |
| | 큰냉면류 | 430 | 650 | 27.2% | 465 | 8.1% | 700 | 7.7% | 26.9% |
| | 큰 컵 류 | 430 | 650 | 27.2% | 465 | 8.1% | 700 | 7.7% | 26.9% |
| | 큰컵 삼양라면 | 430 | 650 | 27.2% | 465 | 8.1% | 700 | 7.7% | 26.9% |
| | 미스터빅류 | 715 | 1,100 | 28.5% | 780 | 9.1% | 1,200 | 9.1% | 28.5% |

▶상기 사리면과 기타 덕용류의 가격인상은 없었음 (경정력 측면)

15

91.     On May 30, 2001, Yakult reached the decision to increase the price for 18 types of Korean Noodles by 9.7% and to make its King Ramen match the price for Nongshim's Shin Ramyun, effective June 1, 2001.

92.     According to the notes created by Choi, a member of Yakult's legal department, "At the time of 2001 price-increase, Kang of Yakult's Marketing Team shared information with Lee of Nongshim, Kim of Samyang, and Hong of Ottogi, prior to the effective date."

93.     On May 14, 2001 (when Nongshim reached the decision to increase the price for 34 types of Korean Noodles by 9.9%), Ottogi reached the decision to increase the price for its Korean Noodles, effective May 22, 2001, and then changed the effective date to July 1, 2001.  On May 14, 2001, Ottogi created a document titled "Ramen Price Increase Review," which indicates that its Jin Ramen would match the price for Nongshim's Shin Ramyun at ₩522 KRW.  Without information from Nongshim, Ottogi could not have created this document on May 14, 2001.

94.     On July 1, 2001, Ottogi increased the price for 52 types of Korean Noodles by 10.5%, and made its Jin Ramen match the price for Nongshim's Shin Ramyun.

95.     Ottogi's business records from this period contain information regarding price increase for Korean Noodles by Samyang, Nongshim, and Yakult.

96.     Also, Yakult's business records from this period contain information regarding price increase by Ottogi.  Notably, the following chart dated May 28, 2001 from Yakult shows Ottogi's price increase:

16

◎ 당사 라면류 가격인상 내역                          2001.5.28

| 구분 | 제품명 | 기호 | 현재 출고가 | 현재 소비자가 | 인상 출고가 | 인상 소비자가 | 박스(vat 포함) |
|---|---|---|---|---|---|---|---|
| 봉지면류 | 참라면 덕용(연) | QBC0 | 154 | | 170 | | 8976 |
| | 쇠고기라면 | QBC1B | 235 | 350 | 268 | 400 | 8844 |
| | 쇠고기 덕용(1백) | QBC0B | 193 | | 213 | | 7029 |
| | 진라면 (순한맛) | QBJ1M | 290 | 430 | 322 | 480 | 10626 |
| | 진라면 (매운맛) | QBJ1H | 290 | 430 | 322 | 480 | 10626 |
| | 진라면 덕용(1백) | QBJ0H | 242 | | 270 | | 8910 |
| | 짜장파티 | QBA1P | 330 | 500 | 367 | 550 | 9688.8 |
| | 북경반점짜장 | QBA1B | 330 | 500 | 367 | 550 | 9688.8 |
| | 스파게티 | QBS1G | 398 | 600 | 430 | 650 | 9460 |
| | 스낵면(쇠) | QBN1B | 235 | 350 | 268 | 400 | 8844 |
| | 비빔면(매일맛) | QB11 | 300 | 450 | 335 | 500 | 11055 |
| | 열 라 면 | QBY1 | 302 | 450 | 322 | 480 | 10626 |
| | 김치라면 | QBK1 | 235 | 350 | 268 | 400 | 8844 |
| | 해물짬뽕면 | QBH1S | 323 | 480 | 367 | 550 | 9688.8 |
| | 꿀계탕면 | QBL1 | 319 | 480 | 367 | 550 | 12111 |
| | 전골면 | QBG1J | 335 | 500 | 367 | 550 | 12111 |
| | 빨개면 | QBB1G | 335 | 500 | 367 | 550 | 12111 |
| | 희라면 | QBO1 | 368 | 550 | 397 | 600 | 13101 |
| | 물 냉 | QBT1 | 368 | 550 | 368 | 550 | 이인상 |
| | 비 냉 | QBT1 | 368 | 550 | 368 | 550 | 이인상 |

97.     The following chart dated May 28, 2001 from Ottogi with its anticipated (but not finalized) price increase contains the same information and even the same format as the one found in Yakult's possession:

◎ 당사 라면류 가격 조정안(최종)                     2001-05-28
(단위:원)

| 구분 | 제품명 | 기호 | 현재 출고가 | 현재 소비자가 | 가이율 | 조정 출고가 | 인상율 | 조정 소비자가 | 인상율 | 가이율 |
|---|---|---|---|---|---|---|---|---|---|---|
| 봉지면류 | 참라면 덕용(연) | QBC0 | 154 | – | | 170 | 10.4% | – | – | |
| | 쇠고기라면 | QBC1B | 235 | 350 | 26.1% | 268 | 14.0% | 400 | 14.3% | 26.3% |
| | 쇠고기 덕용(1백) | QBC0B | 193 | – | | 213 | 10.4% | – | – | |
| | 진라면(순한맛) | QBJ1M | 290 | 430 | 25.8% | 322 | 11.0% | 480 | 11.6% | 26.2% |
| | 진라면(매운맛) | QBJ1H | 290 | 430 | 25.8% | 322 | 11.0% | 480 | 11.6% | 26.2% |
| | 진라면 덕용(1백) | QBJ0H | 242 | – | | 270 | 11.6% | – | – | |
| | 짜장파티 | QBA1P | 330 | 500 | 27.4% | 367 | 11.2% | 550 | 10.0% | 26.6% |
| | 북경반점짜장 | QBA1B | 330 | 500 | 27.4% | 367 | 11.2% | 550 | 10.0% | 26.6% |
| | 스파게티 | QBS1G | 398 | 600 | 27.0% | 430 | 8.0% | 650 | 8.3% | 27.2% |
| | 스낵면(쇠) | QBN1B | 235 | 350 | 26.1% | 268 | 14.0% | 400 | 14.3% | 26.3% |
| | 비빔면(매일맛) | QB11 | 300 | 450 | 26.7% | 335 | 11.7% | 500 | 11.1% | 26.3% |
| | 열 라 면 | QBY1 | 302 | 450 | 26.2% | 322 | 6.6% | 480 | 6.7% | 26.2% |
| | 김치라면 | QBK1 | 235 | 350 | 26.1% | 268 | 14.0% | 400 | 14.3% | 26.3% |
| | 해물짬뽕면 | QBH1S | 323 | 480 | 26.0% | 367 | 13.6% | 550 | 14.6% | 26.6% |
| | 꿀계탕면 | QBL1 | 319 | 480 | 26.9% | 367 | 15.0% | 550 | 14.6% | 26.6% |
| | 전골면 | QBG1J | 335 | 500 | 26.3% | 367 | 9.6% | 550 | 10.0% | 26.6% |
| | 빨개면 | QBB1G | 335 | 500 | 26.3% | 367 | 9.6% | 550 | 10.0% | 26.6% |
| | 희라면 | QBO1 | 368 | 550 | 26.4% | 397 | 7.9% | 600 | 9.1% | 27.2% |
| | 물 냉 | QBT1 | 368 | 550 | 26.4% | 368 | 0.0% | 550 | 0.0% | 26.4% |
| | 비 냉 | QBT1 | 368 | 550 | 26.4% | 368 | 0.0% | 550 | 0.0% | 26.4% |

**D.      Second Price Increase: October 2002 to January 2003**

98.      On October 21, 2002, Nongshim reached the decision to increase the price for 39 types of Korean Noodles by 8.5%, effective October 25, 2002.

99.      Subsequently, Defendants exchanged pricing data, in order to confirm one another's position and to inform their own price increase.

100.      On the same day, Nongshim provided Samyang with information regarding price increase and the timing thereof.

101.      On October 25, 2002, after reviewing the information from Nongshim, Samyang reached the decision to increase the price for 28 types of Korean Noodles by 9.5% and to make its Samyang Ramen match the price for Nongshim's Shin Ramyun, effective November 1, 2002.  Then Samyang shared its own pricing information with other Defendants.

102.      On November 1, 2002, Yakult reached the decision to increase the price for 25 types of Korean Noodles by 8.6% and to make its King Ramen match the price for Nongshim's Shin Ramyun, effective December 1, 2002.

103.      On November 29, 2002, Ottogi reached the decision to increase the price for 40 types of Korean Noodles by 9.1% and to make its Jin Ramen match the price for Nongshim's Shin Ramyun, effective January 2, 2003.

**E.      Third Price Increase: December 2003 to April 2004**

104.      On December 15, 2003, Nongshim reached the decision to increase the price for 24 types of Korean Noodles by 7.7%, effective December 22, 2003.

105.      Subsequently, Defendants exchanged pricing data, in order to confirm one another's position and to inform their own price increase.

106.      On December 18, 2003, Nongshim provided Samyang with information regarding price increase by e-mail.

107.      On February 7, 2004, after reviewing the information from Nongshim, Samyang reached the decision to increase the price for 27 types of Korean Noodles by 7.8% and to make its Samyang Ramen match the price for Nongshim's Shin Ramyun, effective February 21,

2004.  Then Samyang shared its own pricing information with other Defendants.

108.    Nongshim's business records from this period contain information regarding price increase for Korean Noodles by Samyang.

109.    On January 6, 2004, Yakult reached the decision to increase the price for 19 types of Korean Noodles by 7.7% and to make its King Ramen match the price for Nongshim's Shin Ramyun, effective February 1, 2004.  But, as Samyang and Ottogi's price increase was delayed, Yakult changed the effective date from February 1 to March 1, 2004.  Yakult's business records from this period contain price increase information regarding Nongshim, Samyang, and Ottogi.

110.    On January 27, 2004, Yakult provided Samyang with the following information regarding Yakult's price increase by e-mail:



19

111.    On February 23, 2004, Ottogi reached the decision to increase the price for 47 types of Korean Noodles by 6.9% and to make its Jin Ramen match the price for Nongshim's Shin Ramyun, effective April 1, 2004.

**F.      Fourth Price Increase: December 2004 to April 2005**

112.    On December 20, 2004, Nongshim reached the decision to increase the price for 37 types of Korean Noodles by 7.1%, effective December 24, 2004.

113.    Subsequently, Defendants exchanged pricing data, in order to confirm one another's position and to inform their own price increase.

114.    On December 22, 2004, Nongshim provided Samyang with information regarding price increase by e-mail.

115.    On February 24, 2005, after reviewing the information from Nongshim, Samyang reached the decision to increase the price for 32 types of Korean Noodles by 7.2% and to make its Samyang Ramen match the price for Nongshim's Shin Ramyun, effective March 1, 2005.  Then Samyang shared its own pricing information with other Defendants.

116.    On January 7, 2005, Yakult reached the decision to increase the price for 24 types of Korean Noodles by 7.4% and to make its King Ramen match the price for Nongshim's Shin Ramyun, effective February 15, 2005.

117.    But, as Samyang and Ottogi's price increase was delayed, Yakult changed the effective date from February 15 to March 15, 2005 for some of the Korean Noodles.

118.    On January 11, 2005, Yakult provided Samyang with the following information regarding Yakult's price increase by e-mail:

20

**야쿠르트 2005년 라면 가격 인상(안)**

1. 봉지면     단위:원

| 구분 | 입수 | 소비자가격 | | | | 공장도가격(세별) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 현재 | 인상 | 인상률 | 인상가 | 현재 | 조정 | 인상률 | 인상가 |
| 김맵덕용 | 30 | 미포기 | 미포기 | | | 220 | 240 | 9.1% | 20.0 |
| 프리미엄맵시면 | 40 | 550 | 600 | 9.1% | 50 | 255 | 300 | 17.6% | 45.0 |
| 얼큰한 김치라면 | 40 | 500 | 550 | 10.0% | 50 | 332.5 | 365 | 9.8% | 32.5 |
| 왕라면 | 20,30,40 | 550 | 600 | 9.1% | 50 | 367 | 401 | 9.3% | 34.0 |
| | 30,40 | 600 | 650 | 8.3% | 50 | 404 | 434 | | 30.0 |
| 팔도짜장면 | 20 | 650 | 700 | 7.7% | 50 | 434 | 467 | 7.6% | 33.0 |
| | 30,40 | 800 | 700 | | | 434 | 467 | | 30.0 |
| 참마시해물탕 | 20,32 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 |
| 참마시볶음김치 | 20,32 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 |
| 이천쌀설렁탕면 | 20,32 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 |

2. 용기면     단위:원

| 구분 | 입수 | 소비자가격 | | | | 공장도가격(세별) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 현재 | 인상 | 인상률 | 인상가 | 현재 | 조정 | 인상률 | 인상가 | |
| | | 600 | 650 | 8.3% | 50 | 400 | 430 | 7.5% | 30.0 | |
| 육개장 | 24 | 600 | 650 | 8.3% | 50 | 400 | 430 | 7.5% | 30.0 | |
| 왕뚜껑컵 | 6,24 | 600 | 650 | 8.3% | 50 | 400 | 430 | 7.5% | 30.0 | |
| | 18 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 | |
| 김치왕뚜껑 | 18 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 | |
| 우동왕뚜껑 | 18 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 | |
| 짜장왕뚜껑 | 18 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 | |
| 짬뽕왕뚜껑 | 18 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 | |
| | 16 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 | 비빔면컵 |
| 탕면 | 16 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 | 왕컵진국설렁 |
| 컵 | 16 | 800 | 850 | 6.3% | 50 | 530 | 560 | 5.7% | 30.0 | 일품해물왕컵 |
| | 12 | 1,200 | 1,300 | 8.3% | 100 | 780 | 845 | 8.3% | 65.0 | 빅3해물 |
| | 12 | 1,200 | 1,300 | 8.3% | 100 | 780 | 845 | 8.3% | 65.0 | 빅3참치 |
| | 12 | 1,400 | 1,500 | 7.1% | 100 | 840 | 910 | 8.3% | 70.0 | 볶음김치면 |

119. On March 14, 2005, Ottogi reached the decision to increase the price for 30 types of Korean Noodles by 7.4% and to make its Jin Ramen match the price for Nongshim's Shin Ramyun, effective April 16, 2005.

120. On February 25, 2005, even before it finalized the price increase internally, Ottogi provided Samyang with the information regarding Ottogi's price increase by e-mail.

121. Additionally, Yakult's business records dated January 5, 2005 and February 11, 2005 contain the information regarding price increase by Nongshim, Samyang and Ottogi.

122. Also, Nongshim's business records dated February 22, 2005, contain information regarding price increase by Samyang, Ottogi, and Yakult.

123. Nongshim's business records last updated on March 10, 2005, contain detailed information regarding Ottogi's price increase and strategy, which had not even been finalized by Ottogi.

21

## G.    Fifth Price Increase: March to September 2007

124.    On February 12, 2007, Nongshim reached the decision to increase the price for 39 types of Korean Noodles by 6.5%, effective March 1, 2007.

125.    Subsequently, Defendants exchanged pricing data, in order to confirm one another's position and to inform their own price increase.

126.    On February 23, 2007, Nongshim provided Samyang with the price increase announcement drafted for its dealers by facsimile.

127.    On February 26, 2007, Nongshim provided Samyang with additional information regarding price increase by e-mail.

128.    On February 26, 2007, Samyang created a document incorporating Nongshim's price increase records.

129.    On March 7, 2007, Yakult reached the decision to increase the price for 21 types of Korean Noodles by 6.6% and to make its King Ramen match the price for Nongshim's Shin Ramyun, effective April 1, 2007.

130.    On March 20, 2007, Yakult provided Samyang with the following information regarding Yakult's price increase by e-mail:

131.    On March 22, 2007, after reviewing Nongshim's information, Samyang reached the decision to increase the price for 28 types of Korean Noodles by 7.3% and to make its Samyang Ramen match the price for Nongshim's Shin Ramyun, effective April 16, 2007.

132.    On April and May, 2007, Samyang provided Nongshim and Ottogi with information regarding Samyang's price increase as well as production schedule.  For example, in an e-mail to Ottogi dated April 11, 2007, a Samyang employee stated, "I think our price increase will take effect beginning on the 16th.  Though the plans have not been finalized yet, I understand that internally we have decided to increase the price on the 16th.  However, there is a possibility for change.  For specific information regarding price increase per product, please refer to the attached file."

133.    On July 23, 2007, Ottogi reached the decision to increase the price for 90 types of Korean Noodles by 8% and to make its Jin Ramen match the price for Nongshim's Shin Ramyun, effective September 1, 2007.

134.    On July 27 and 31, 2007, Ottogi provided Samyang with information regarding Ottogi's price increase and the timing thereof by e-mail.

135.    On August 16, 2007, Yakult provided Samyang with information regarding Ottogi's price increase by e-mail.

136.    Yakult's business records dated March 5, 2007 contain information regarding price increase by Nongshim, Samyang, and Ottogi.

137.    Ottogi's business records dated February 28, 2007 contain specific and accurate detail regarding price increase by Nongshim, Samyang, and Yakult.

**H.    Sixth Price Increase: February to April 2008**

138.    Samyang's internal document dated January 11, 2008 states, "Plan to increase price in 2008 for Korean Noodles and other snacks …."  According to the confession by Suh of Samyang's Marketing Team, "This information was obtained by Samyang's then Market Research Director Wee from Nongshim's Choi by a phone call."

139.    On February 12, 2008, Nongshim reached the decision to increase the price for 42 types of Korean Noodles by 11.9%, effective February 20, 2008.

23

140.     Subsequently, Defendants exchanged pricing data, in order to confirm one another's position and to inform their own price increase.

141.     On February 18, 2008, Nongshim provided Samyang with information regarding Nongshim's price increase by e-mail.  It stated, "There should be an official announcement this afternoon.  I will send you information regarding factory prices then.  Also, do not rely on these numbers too much as they may not be correct.  Also, when dealing with Yakult, please act as though you did not even receive any rough figures."

142.     Between February 20 and March 3, 2008, Nongshim provided Samyang with additional information regarding Nongshim's price increase by e-mail.

143.     On February 18, 2008, after obtaining Nongshim's price increase information, Samyang decided that it would also increase the price for its Korean Noodles, effective March 1, 2008, and shared this decision with Nongshim, Ottogi, and Yakult.

144.     On February 28, 2008, after reviewing the information from Nongshim, Samyang reached the decision to increase the price of 32 types of Korean Noodles by 12.6% and to make its Samyang Ramen match the price for Nongshim's Shin Ramyun, effective March 1, 2008.

145.     On February 27 and 28, 2009, Samyang provided Nongshim, Yakult, and Ottogi with information regarding Samyang's price increase by e-mail.

146.     On March 3, 2008, Samyang provided Nongshim, Yakult, and Ottogi with information regarding the Old Price Support Strategy by e-mail.

147.     On February 26, 2008, Ottogi reached the decision to increase the price of 72 types of Korean Noodles by 13.5% and to make its Jin Ramen match the price for Nongshim's Shin Ramyun, effective April 1, 2008.

148.     On February 29, 2008, Ottogi provided Samyang with information regarding Ottogi's price increase and production schedule by e-mail.  It stated, "As I told you yesterday, price increase has not yet been finalized, but I am sending you the current status on Ottogi's price increase plan for your information."

149.     On March 6, 2008, Ottogi provided Samyang with information regarding

1   Ottogi's production schedule by e-mail.

2       150.    On March 10, 2008, Yakult reached the decision to increase the price for 23

3   types of Korean Noodles by 12.5% and to make its King Ramen match the price for

4   Nongshim's Shin Ramyun, effective April 1, 2008, for the most important products, and

5   effective May 1, 2008, for other, additional products.

6       151.    On March 5, 2008, Yakult provided Samyang with information regarding

7   Yakult's price increase by e-mail.

8       152.    On March 6, 2008, Yakult provided Nongshim and Samyang with the following

9   information regarding Yakult's production schedule by e-mail:

10

11  메일제목 가격인상제품 생산계획
    보낸날짜 2008년 3월 06일, 오전 08시 54분 보낸이 김○ ○ <howll@yakult.co.kr>
12  받는이 " 삼양마케팅실" <marketone@hanmail.net>, 박○ ○ <sungsoo@nongshim.com>
13  봉지 비빔면 3/5 일품해물라면 3/6 일품짜장면 3/7
    용기 왕뚜껑 3/6 김치왕뚜껑 3/6 짬뽕왕뚜껑 3/7 우동왕뚜껑 3/9 도시락 3/6
14      미니왕뚜껑 3/8
15  기타제품 봉지 맵고시원한면 3/11 구수한장라면 3/10 얼큰한 장라면 3/14
        왕라면 3/22 팔도설렁탕면 3/19

16

17

18      153.    Samyang, Ottogi, and Yakult finalized the decision to increase the price for

19  their Korean Noodles on February 28, February 26, and March 10, 2008, respectively.  But, a

20  journal entry dated February 22, 2008, kept by a Nongshim employee contained accurate

21  information regarding the price increase by Samyang, Ottogi, and Yakult.

22      154.    On March 6, 2008, Yakult provided Nongshim and Samyang information

23  regarding Yakult's manufacture schedule for the price-increased products by e-mail.

24  **I.    March 2008 Ramen Conference**

25      155.    On March 26, 2008, Defendants attended the Ramen Assembly Conference at

26  Capital Hotel in Seoul, Korea.  According admissions by Samyang employees (Mr. Lee and

27  Mr. Kim), at this meeting, Defendants agreed that they would not independently postpone price

28  increase or independently decrease the already increased price for Korean Noodles.

**J.**     **KFTC Order**

156.    On July 12, 2012, the KFTC issued the KFTC Order, finding that Defendants colluded and conspired to fix the price for Korean Noodles anti-competitively, and, as a result, they increased the price for their respective Korean Noodles at the same time to similar levels between May 2001 and February 2010, for at least 6 times.

157.    Therefore, the KFTC Order:

    a.  enjoined Defendants from committing anticompetitive acts by collaboratively deciding the price for Korean Noodles;

    b.  enjoined Defendants from exchanging pricing information regarding Korean Noodles; and

    c.  imposed the following penalties on Defendants in total amount of ₩ 136,244,000,000 KRW (approximately $120 million USD), collectively:

        i.  Nongshim: ₩108,070,000,000 KRW;

        ii.  Samyang: ₩12,060,000,000 KRW;

        iii.  Ottogi: ₩9,848,000,0000 KRW; and

        iv.  Yakult: ₩6,266,000,000 KRW.

158.    On July 17, 2012, Samyang announced that it was excused from the ₩12 billion KRW penalty because it voluntarily reported the conspiracy to avail itself of the Leniency Program.

**K.**     **The Seoul High Court Upheld the KFTC's Ruling.**

159.    On November 8th, 2013, in an action commenced by Nongshim and Ottogi to vacate the penalties imposed by the KFTC, the Seoul High Court ruled against Nongshim and Ottogi, and upheld the KFTC's ruling.  In the Opinion, the Seoul High Court found, "Ramen manufacturers sequentially implemented price increases within a close time period, deciding upon similar levels of average rate of increase.  For important products with a lot of market share, the pricing was the same down to ₩1.  …. Without exchange of pricing information, based solely on the information obtained through the media or independent market study, it

26

would have been difficult to prepare such precise and detailed information regarding competitors' prices.  Therefore, it appears that the pricing aligned as a result of the exchange of pricing information."

160.    Similarly, Yakult sought to vacate the penalties imposed by the KFTC.  On December 4th, 2013, the Seoul High Court ruled against Yakult and upheld the KFTC's ruling against it.

161.    Samyang avoided the penalty by voluntarily reporting the conspiracy to avail itself of the Leniency Program.

162.    On July 17, 2012, Samyang announced that it was excused from the ₩12 billion KRW penalty because it voluntarily reported the conspiracy to avail itself of the Leniency Program

**L.    The Conspiracy Directly Affected the Korean Noodles Sold in the United States.**

163.    Defendants' unlawful conspiracy affected not only the Korean Noodles price in South Korea but also the Korean Noodles price across the world, including the United States.

164.    During the Class Period, Defendant sold their price-fixed Korean Noodles in the United States.  They generally shipped their respective Korean Noodles directly from South Korea.

165.    In June 2005, Nongshim established its United States manufacturing facility in Rancho Cucamonga, California, in order to expand its business into the American market.  The factory has an annual production capacity of approximately 200 million Korean Noodles.

166.    Some of the Korean Noodles that Nongshim sells in the United States are now manufactured in California.  The rest of the Korean Noodles that Nongshim sells in the United States are still imported from South Korea.

     **a.    Price Increase in the United States Following<br>       the October 2002-January 2003 Price Increase in South Korea**

167.    In Korea, between October 2002 and January 2003, Defendants anti-competitively increased the price for Korean Noodles.  Then, in the United States, in February 2003, Nongshim announced that, starting on March 1st, 2003, the Korean Noodles that it

27

supplied would be priced 9% higher.  Messrs. Yong-Hoon Lee and Chae-Kyung Kim of Nongshim America stated, "By April [2003], the ramen products will be sold at the newly adjusted price" to consumers in the United States.  As a result, the retail price for Shin Ramyun increased from $8.99-$9.99 to 10.99, per 20-piece box, by approximately 10%.

168.   In February 2003, Mr. Joon-Back Lee, a manager at Assi Supermarket in Los Angeles, stated, "Because, always, after Nongshim increases its price [for Korean Noodles], approximately a week or two later, Ottogi and Bingre increase their prices.  Therefore, I am expecting a market-wide ramen price movement."

169.   Korea Daily and Korea Times, both widely-circulated newspapers for the Korean-speaking population in the United States, reported on February 20, 21, and 25, that, in response to Nongshim's price increase, its competitors including Samyang, Ottogi, Yakult, were also likely to increase the price for their Korean Noodles they ship from Korea.

170.   The KFTC Order shows that Nongshim increased the price for its Korean Noodles on October 25, 2002 by 8.5% on average (sum of the rates of price increase for Defendants' affected products divided by the number of categories).  Indeed, Nongshim's Business Operations Report[1] reveals that, between 2002 and 2003, Shin Ramyun's annual domestic (Korean) sales price jumped from ₩11,517 KRW for 30 units to ₩12,111 KRW.  At the same time, Shin Ramyun's annual export price (including shipment to the United States) jumped from $5.75 USD for 20 units to $6.30 USD.

171.   Also, the KFTC Order shows that Samyang increased the price for its Korean Noodles on November 1, 2002 by 9.5% on average.  Indeed, Samyang's Business Operations Report reveals that, between 2002 and 2003, Samyang Ramen's annual domestic (Korean) sales price jumped from ₩11,403.77 KRW per box to ₩12,418 KRW.  At the same time, Samyang Ramen's annual export price (including shipment to the United States) jumped from $7.00 USD per box to $9.40 USD.

---

[1] Some of Defendants' business reports are available on DART at http://dart.fss.or.kr/.  DART (Data Analysis, Retrieval and Transfer System) is the repository of Korea's corporate filings.

### b. Price Increase in the United States Following the December 2003-April 2004 Price Increase in South Korea

172.     In Korea, between December 2003 and April 2004, Defendants anti-competitively increased the price for Korean Noodles.  In the United States, in February 2004, Mr. Yong-Hoon Lee of Nongshim America stated, "Because Korea [Nongshim Co., Ltd.] increased the ramen price by 6.5% on average, the import price [from Korea] also increased. …. We decided to increase the ramen price [in the United States] by 8-9%, starting in April."

173.     The KFTC Order shows that Nongshim increased the price for its Korean Noodles on December 22, 2003 by 7.7% on average, and again on December 24, 2004 by 7.1% on average.  Nongshim's Business Operations Report reveals that, between 2003 and 2004, Shin Ramyun's annual domestic (Korean) sales price jumped from ₩12,111 KRW for 30 units to ₩13,233 KRW, and stayed at that level until the end of 2006.  Between 2004 and 2005 (after some delay), Shin Ramyun's annual export price (including shipment to the United States) jumped from $6.30 USD for 20 units to $6.45 USD, and again between 2005 and 2006, jumped from $6.45 USD to $6.65 USD.

174.     The KFTC Order shows that Samyang increased the price for its Korean Noodles on February 21, 2004 by 7.8% on average.  Samyang's Business Operations Report reveals that, between 2003 and 2004, Samyang Ramen's annual domestic (Korean) sales price jumped from ₩12,418 KRW per box to ₩12,958 KRW. At the same time, Samyang Ramen's annual export price (including shipment to the United States) jumped from $4.57 USD per box to $4.80 USD.

### c. Price Increase in the United States Following the December 2004-April 2005 Price Increase in South Korea

175.     In Korea, between December 2004 and April 2005, Defendants anti-competitively increased the price for Korean Noodles.  In the United States, in December 2004, Mr. Myung-Chul Shin of Nongshim America stated, "It is customary for the export price to increase when the price within Korea increases."  Mr. Yong-Hoon Lee of Nongshim America

29

also stated, "Last year, after the November price increase [in Korea], the price increase became effective in the United States starting in April.  This year will be similar."  Then in March 2005, Nongshim in Korea announced to the Korean import wholesalers in the United States that, starting on April 15, the price would increase by 8-10% for Korean Noodles, including Shin Ramyun, Neoguri, Japaghetti, and Big Sabalmyun.

176.    On December 23, 2004, Korea Daily stated, "There are precedents for ramen products and snacks where, when the price in Korea increases, the export price uniformly increases."

177.    On December 24, 2004, Korea Times stated, "Based on the precedents where the price increase in the United States trails the price increase in Korea by 2-3 months, it is likely that the price increase will be implemented by next March at the latest for the products [including Korean Noodles] distributed to New York supermarkets and grocery stores."

178.    Samyang USA increased the price for packaged ramen products by 5%-7% in February 2005.  Mr. Shi-Young Lee of Samyang USA stated, "There is a lot of pressure because the price for the main ingredients including flour and oil increased, and the exchange rate dropped.  ….  The impact of the ramen price increase by 8% in early March in Korea will reach the U.S. around July."

179.    In March 2005, Nongshim America disclosed that, in response to the December 2004 price increase in Korea by 8% for ramen products and 18% for snacks, it would increase the price for all the products sold in the United States by 8%-10%.

180.    Indeed, Nongshim increased the wholesale price for Korean Noodles, and, in July 2005, the retail price for Shin Ramyun increased from $10.99-$11.99 to $12.99 per box, and the retail price for Japaghetti also increased to $12.99-$13.99.

181.    On June 15, 2005, Korea Times reported, "As Nongshim, the market leader with Shin Ramyun, raised the price in last April, other companies followed the move and also increased the wholesale price."

182.    Ottogi, in May 2005, increased price for its Korean Noodles by approximately 20%.  As a result, the retail price for Jin Ramen increased from $9.99, per box, to $10.99-

1    $11.99.

2         183.    The KFTC Order shows that Samyang increased the price for its Korean

3    Noodles on March 1, 2005 by 7.2% on average.  Samyang's Business Operations Report

4    reveals that, between 2004 and 2005, Samyang Ramen's annual domestic (Korean) sales price

5    jumped from ₩14,680 KRW per box to   ₩16,040 KRW. At the same time, Samyang Ramen's

6    annual export price (including shipment to the United States) jumped from $4.80 USD per box

7    to $5.00 USD.

8

9         **d.  Price Increase in the United States Following**
          **the March 2007-September 2007 Price Increase in South Korea**

10        184.    In Korea, between March 2007 and September 2007, Defendants anti-

11   competitively increased the price for Korean Noodles.  In the United States, on June 6, 2007,

12   Nongshim America announced that it was increasing the price for some of its Korean Noodles,

13   including Shin Ramyun, and snacks by 6%-13%, starting with the preceding month's shipment.

14   Accordingly, the retail price for Shin Ramyun was to increase from $13-$14 per 20-piece box

15   to approximately $15, and the retail price for Sabalmyun was to increase from $7.99 per 12-

16   piece box to approximately $9.

17        185.    On June 7, 2007, Korea Times reported that, in response to Nongshim's price

18   increase, it appeared likely that other competitors including Samyang, Bingre, and Paldo

19   [Yakult] would also increase the price for their Korean Noodles shipped to the United States

20   market.

21        186.    In December 2007, Samyang USA increased the price for its Korean Noodles

22   by 15%.  As a result, the retail price for a 20-piece box of Samyang Ramen increased to

23   $12.99.

24        187.    In January 2008, Ottogi increased the wholesale price for its Korean Noodles by

25   15%-20%.

26        188.    Paldo [Yakult] also planned to increase the wholesale price for its Korean

27   Noodles in March 2008.

28

189.    The KFTC Order shows that Nongshim increased the price for its Korean Noodles on March 1, 2007 by 6.5% on average.  Nongshim's Business Operations Report reveals that, between 2006 and 2007, Shin Ramyun's annual domestic (Korean) sales price jumped from ₩13,233 KRW for 30 units to ₩14,190 KRW.  At the same time, Shin Ramyun's annual export price (including shipment to the United States) jumped from $6.65 USD for 20 units to $7.07 USD.

### e.    Price Increase in the United States Following the February 2008-April 2008 Price Increase in South Korea

190.    In Korea, between February 2008 and April 2008, Defendants anti-competitively increased the price for Korean Noodles.  In the United States, on February 20, 2008, Mr. Yong-Hoon Lee of Nongshim America announced, "As for the products manufactured in the United States, rather than the inflation in Korea, but in response to the increase in price for the main ingredients including flour and palm oil, the price will be increased before April at the latest."  The products that Nongshim manufactures in the United States include Shin Ramyun, Japaghetti, and Cup Ramen.

191.    Also, on February 21, 2008, Mr. Myung-Chul Shin, Nongshim America's manager for the East Coast, stated, "Right now we are waiting for the announcement from the parent company in Korea.  In Korea, the price increase becomes effective immediately after the announcement.  But, in the United States, there should not be any sudden price increase because, customarily, there is usually one or one and a half month of waiting period.  But, we expect the price increase to become effective [in the United States] in March or April."

192.    Mr. Yong-Hoon Lee of Nongshim America, who is in charge of distribution, stated, "Currently we are supplying 14 products manufactured in the United States and approximately 30 items shipped from Korea.  Because most products are ramen and snacks, which require flour, price increase is inevitable."

193.    On February 28, 2008, Korea Daily reported, "Samyang and Ottogi announced in last December and in January that they would increase prices by 10%-15%, and Paldo

[Yakult] is also supposed to increase prices after March.  Nongshim America is reviewing the timing and extent of the price increase.  Most of these companies are planning a second wave of price increase in October, in addition to the price increase early this year."

194.    The KFTC Order shows that Nongshim increased the price for its Korean Noodles on February 20, 2008 by 11.9% on average.  Nongshim's Business Operations Report reveals that, between 2007 and 2008, Shin Ramyun's annual domestic (Korean) sales price jumped from ₩14,190 KRW for 30 units to ₩16,368 KRW.  At the same time, Shin Ramyun's annual export price (including shipment to the United States) jumped from $7.07 USD for 20 units to $7.50 USD.

195.    The KFTC Order shows that Samyang increased the price for its Korean Noodles on March 1, 2008 by 12.6% on average.  Samyang's Business Operations Report reveals that, between 2007 and 2008, Samyang Ramen's annual domestic (Korean) sales price jumped from ₩17,200 KRW per box to ₩18,048 KRW.  At the same time, Samyang Ramen's annual export price (including shipment to the United States) jumped from $5.00 USD per box to $6.30 USD.

196.    As a direct and proximate result of Defendants' unlawful conduct, Gaju and other members of the Class have been injured in their business and property in that they paid more for Korean Noodles than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**M.      Plaintiff's Claims Are Not Barred by the Statute of Limitations**

197.    Gaju incorporates by reference all the above allegations as if fully set forth herein.

198.    Gaju had neither actual nor constructive knowledge of the facts constituting its claim for relief.  Gaju and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until July 12, 2012, when the KFTC Order was issued, revealing that Defendants had conspired to increase the price for Korean Noodles.  Defendants engaged in a secret conspiracy that did not reveal facts that would put Gaju or the Class on inquiry notice that there was a

conspiracy to fix prices for Korean Noodles.

199.    Because Defendants' conspiracy was kept secret, Gaju and members of the Class were unaware of Defendants' unlawful conduct alleged herein.  Gaju and members of the Class did not know that they were paying artificially high prices for Korean Noodles.

200.    For these reasons, the statute of limitations applicable to the claims of Gaju and members of the Class did not begin to run, and has been tolled.

201.    For example, Defendants issued false and misleading announcements concerning the reasons for the price increase for their Korean Noodles, none of which disclosed that the Defendants had conspired to fix and increase the price of Korean Noodles.

202.    On May 11, 2001, Nongshim stated it was considering price increase for its Korean Noodles including Shin Ramyun by approximately 10% because "the cost for main ingredients, including flour, increased by 15% due to the increase in the exchange rate."  There was no mention of the conspiracy among Defendants to increase the price of Korean Noodles.

203.    On October 24, 2002, Nongshim stated that it would increase the price of its Korean Noodles by 8.5% "because of the increase in the cost for main ingredients, including palm oil and flour, and other economic factors."  There was no mention of the conspiracy among Defendants to increase the price of Korean Noodles.

204.    On December 18, 2003, Nongshim stated that it would increase the price for its Korean Noodles by 6.5% "because the cost of main ingredients for ramen, including palm oil and starch, increased internationally, and, due to the unstable climate, the rising price of fresh produce domestically, increasing the cost of goods sold."  There was no mention of the conspiracy among Defendants to increase the price of Korean Noodles.

205.    On February 24, 2004, Samyang stated it would increase the price for its Korean Noodles by 6% "because, since the second half of last year, the price for main ingredients, including palm oil, starch, red pepper, garlic, and scallion, increased drastically."  There was no mention of the conspiracy among Defendants to increase the price of Korean Noodles.

206.    On December 23, 2004, Nongshim stated that it would increase the price for its Korean Noodles by 8% "because the price for fresh produce increased, the price for oil,

necessary for packaging, increased, and additional expenses for environmental issues including the recycling program increased." There was no mention of the conspiracy among Defendants to increase the price of Korean Noodles.

207. On February 27, 2007, Nongshim stated that it would increase the prices for its Korean Noodles and other snacks by 7.4% "because the cost of imported main ingredients, including flour, palm oil, and starch, as well as the price for fresh produce increased, and additional expenses for environmental issues including the recycling program increased." There was no mention of the conspiracy among Defendants to increase the price of Korean Noodles.

208. On February 18, 2008, Nongshim stated that it would increase the price of its Korean Noodles "because the sudden increase in the price of the imported main ingredients added to the cost of goods sold." There was no mention of the conspiracy among Defendants to increase the price of Korean Noodles.

209. But, as the KFTC found, there was little correlation between the increase in Defendants' cost of goods sold and Defendants' increase in the price of Korean Noodles:

|  | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|
| Rate of Increase in Cost of Goods Sold | 2.9% | 5.6% | 2.5% | 5.3% | −2.4% | 7.4% | 24.3% | 3.9% | 5.8% |
| Rate of Increase in Price for Korean Noodles | 10.0% | − | 8.5% | 6.7% | − | 7.8% | 13.5% | − | −4.9% |



* Rate of Increase in Cost of Goods Sold in Blue.
  Rate of Increase in Price for Korean Noodles in Red.

210.    The affirmative acts of Defendants, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a way that precluded detection.

211.    By nature, Defendants' conspiracy to fix the price of Korean Noodles was inherently self-concealing.

212.    As a result of Defendants' fraudulent concealment of their conspiracy, the statute of limitations applicable to the claims of Gaju and members of the Class did not begin to run, and has been tolled.

## IX.    CLAIM FOR RELIEF

### Violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3

213.    Gaju incorporates by reference all the above allegations as if fully set forth herein.

214.    Beginning in at least December 2000, Defendants and their co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by artificially reducing or eliminating competition in the United States.

215.    In particular, Defendants have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of Korean Noodles sold in the United States.

216.    As a result of Defendants' unlawful conduct, the prices for Korean Noodles were raised, fixed, maintained and stabilized in the United States.

217.   Defendants' combination or conspiracy consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

218.   For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did:

    a.   participate in meetings and conversations to discuss the prices and supply of Korean Noodles;

    b.   communicate orally and in writing to fix prices and manipulate the supply of Korean Noodles, including but not limited to, communicating price increases with one another;

    c.   agree to manipulate prices and supply of Korean Noodles sold throughout the world and in the United States, in a manner that deprived direct purchasers of free and open competition;

    d.   price Korean Noodles in accordance with the agreements reached; and

    e.   sell Korean Noodles to direct purchasers in the United States at non-competitive prices.

219.   Defendants' conspiracy had the following effects, *inter alia*:

    a.   price competition in the sale of Korean Noodles by Defendants has been restrained, suppressed, and eliminated in the United States;

    b.   prices for Korean Noodles sold by Defendants has been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and

    c.   direct purchasers of Korean Noodles have been deprived of the benefit of free and open competition in the purchase of Korean Noodles.

220.   As a direct and proximate result of Defendants' unlawful conduct, Gaju and the other members of the Class have been injured in their business and property in that they paid more for Korean Noodles than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.   This action may proceed as a class action, with Gaju as the designated Class representative and its counsel as Class Counsel;

B.     Defendants have engaged in combination and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' violation;

C.     Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

D.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein, including:

    i.     continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract combination or conspiracy having any similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

    ii.     communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of Korean Noodles, information concerning prices, customers, markets or other terms or conditions of sale of any such products except to the extent necessary in connection with bona fide business transactions between the parties to such communications.

E.     Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.     Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.     Plaintiff and members of the Class receive such other or further relief as may be just and proper.

Dated: January 22, 2014

**COTCHETT, PITRE & McCARTHY LLP**

By:   /s/ Steven N. Williams
Steven N. Williams
Gene W. Kim
Elizabeth Tran
San Francisco Airport Office Ctr.
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

**LOWEY DANNENBERG COHEN & HART, P.C.**

By:   /s/ Barbara Hart
Barbara Hart (*pro hac vice* to be submitted)
Sung-Min Lee (*pro hac vice* to be submitted)
One North Broadway, Suite 509
White Plains, NY 10601-2301
Telephone:      (914) 997-0500
Facsimile:      (914) 997-0035

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff demands a trial by jury as to all issues so triable.

3

4

Dated: January 22, 2014

5

6    **COTCHETT, PITRE & McCARTHY LLP**          **LOWEY DANNENBERG COHEN &**
                                                  **HART, P.C.**
7    By:  /s/ Steven N. Williams
     Steven N. Williams                           By:  /s/ Barbara Hart
8    Gene W. Kim                                   Barbara Hart (*pro hac vice* to be submitted)
     Elizabeth Tran                               Sung-Min Lee (*pro hac vice* to be submitted)
9    San Francisco Airport Office Ctr.            One North Broadway, Suite 509
     840 Malcolm Road, Suite 200                  White Plains, NY 10601-2301
10   Burlingame, CA 94010                         Telephone:      (914) 997-0500
     Telephone: (650) 697-6000                    Facsimile:      (914) 997-0035
11   Facsimile: (650) 697-0577

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28